CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

08/01/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| S. GAIL MORRIS,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMUNICATIONS CORPORATION<br>OF AMERICA, INC.,<br><br>    Defendant. | Case No. 3:18CV00063<br><br>Related Case No. 3:17-cv-00047-GEC<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff S. Gail Morris ("Morris"), files her Complaint against Defendant, Communications Corporation of America, Inc. ("CCA"), and alleges as follows:

### NATURE OF THE ACTION

1. By this action, Morris seeks all relief to which Morris is entitled pursuant to the claims and counts described herein, including preliminary and permanent injunction, reinstatement, back pay, attorneys' fees and costs, and any other form of relief, however denominated, at law or equity, available to Morris arising out of CCA's willful and malicious disregard of Morris's lawful rights and privileges as protected by the federal Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12111, *et seq*. ("ADA"). The ADA at 42 U.S.C. § 12203(b) provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

CCA terminated Morris's employment at CCA to retaliate against Morris for her having aided or encouraged her wife, Santa Marie Via ("Via"), who was exercising her rights under the ADA against CCA at the time that CCA terminated Morris's employment.

## PARTIES, JURISDICTION, AND VENUE

2. Morris was a managerial employee of CCA, who until September 1, 2017, worked at CCA as a data processing manager, and had worked at CCA for 22 years. Morris is married to Via, who was a managerial employee of CCA until CCA terminated Via's employment in violation of the ADA. At the time that CCA terminated Morris's employment, Via was prosecuting claims against CCA in this Court in *Via v. Communications Corporation of America, Inc., et al.,* Case No. 3:l7-cv-00047-GEC.

3. CCA is a for-profit Virginia corporation in the business of producing and issuing mass mail campaigns from its sole plant in Boston, Virginia. At all times relevant to this Complaint, CCA employed more than 150 persons.

4. This Court has original subject-matter jurisdiction over this matter under 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5(f)(3).

5. Personal jurisdiction is proper in this judicial district because CCA maintains continuous and systematic contact within this judicial district.

6. Venue within this judicial district is proper under 28 U.S.C. § 1391(b), because CCA is subject to personal jurisdiction in this judicial district and because a substantial part of the conduct giving rise to this action occurred within this judicial district.

## CONDITIONS PRECEDENT

7. Any and all conditions precedent to bringing or maintaining this action have been satisfied by Morris or have been excused or waived by CCA.

## FACTS

8. On May 16, 2016, Via received a registered letter from Steven Fisher ("Fisher"), owner of CCA, dated May 12, 2016, summarily terminating Via's employment with CCA.

9. On or about October 25, 2016, Via filed a charge of disability discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in Richmond, Virginia. Via's charge alleged disability discrimination in the failure of CCA and Fisher, or either of them, to engage in an interactive process on a good faith basis to determine reasonable accommodations to enable Via to resume her work, and in CCA's and Fisher's ultimate failure to provide reasonable accommodation to Via.

10. On April 18, 2017, the EEOC issued notice to Via of her right to sue with respect to her charge.

11. On July 17, 2017, Via commenced an action in this Court, *Via v. Communications Corporation of America, Inc., et al.,* Case No.3:l7-cv-00047-GEC.

12. After Via filed her charge with the EEOC, Morris continued to work at CCA.

13. Morris had commenced work at CCA upon her graduation from high school in 1995, and had moved up in management, attaining the status of Manager of the Data Processing Division at CCA.

14. As part of her duties in the Data Processing Division, Morris managed four different crews of four people round the clock, 24 hours-per-day, seven days a week.

15. On Saturday, August 26, 2017, Via and Morris were guests at a pool party hosted by Tina Cropp, arriving at approximately 1:00 p.m., and leaving at approximately 9:30 p.m.

16. Upon arriving home from the pool party, Via and Morris went to bed and fell asleep.

17. On the evening of August 26, 2017, Morris's night crew, led by Luis Yrupailla ("Yrupailla"), was working in the Data Processing area of the CCA facility.

18. At approximately 11:00 p.m. on August 26, 2017, Morris received a phone call from Yrupailla, who reported that a fire had started at the CCA facility.

19. Yrupailla was frantic. Morris instructed Yrupailla to call 911. Yrupailla told Morris that he had done that.

20. Morris then told Yrupailla that she was on the way to the CCA facility.

21. Before leaving for CCA, Morris called Mitzi Mills, Fisher's right-hand-man at the time, and CCA's Director of Production.

22. Upon being informed by Morris of the fire at CCA, Mitzi Mills told Morris "I'm on my way," then hung up.

23. Morris drove over to the CCA facility, arriving at the burning building at about the same time that Mitzi Mills arrived with her husband, Nathan See ("See"), a full-time machine technician for CCA who had been working on repair and maintenance at the CCA facility.

24. Upon her arrival at the CCA facility, Morris found Yrupailla and spoke with him.

25. Standing on a hillside overlooking the fire as the Culpeper Fire Department arrived, Yrupailla told Morris that he and his crew were working in the Data Processing area of the CCA facility on the first floor, when they began to smell smoke. Yrupailla followed the smell and found a fire burning in an enclosed machine shop that CCA had recently installed in the middle of the first floor of the facility.

26. Yrupailla told Morris that no smoke alarm or sprinkler system had gone off.

27. The absence of a smoke alarm did not surprise Morris, because Mitzi Mills routinely turned the smoke alarms off to avoid false reports of fire, which had historically occurred whenever

4

someone burned food in the kitchen area of the facility. The absence of any sprinkler activity did not surprise Morris because the CCA facility did not have a sprinkler system.

28. Yrupailla told Morris that, after he found the fire, he alerted his crew and another crew working in a separate division to escape. Yrupailla then attempted to put the fire out using a fire extinguisher.

29. But Yrupailla could not get into the new machine shop. The door to the shop was locked, as it always was.

30. Without any way of getting into the machine shop to put out the fire, Yrupailla tried to use the extinguisher on the ceiling tiles of the enclosed shop, to no avail. He then escaped.

31. Outside the burning building, Culpeper Fire Chief, Kenneth Mills ("Chief Mills"), met with See, who had brought an iPad® that contained mechanical drawings of the CCA facility.

32. Working with See, Chief Mills determined that the fire had commenced at least two hours before his arrival in an HVAC unit on the roof of the CCA facility, directly above the machine shop, causing the roof to collapse above the machines shop, from which the fire spread.

33. See advised Chief Mills that that HVAC unit had been causing problems for two weeks or so prior to the fire.

34. The fire was not containable. By 2:00 a.m. Sunday morning, August 27, 2017, Chief Mills understood that the CCA facility was to be a total loss.

35. On information and belief, on Sunday morning, August 27, 2017, See and/or Mitzi Mills advised Fisher of the fire, its cause, and its extent.

36. Fisher came to the burning facility not later than the afternoon of August 27, 2017.

37. Most of CCA's managers and employees, including Yrupailla, came to the facility that day. Most spoke with Fisher.

5

Case 3:18-cv-00063-GEC   Document 1   Filed 08/02/18   Page 5 of 10   Pageid#: 5

38. As a result of the fire that commenced late on August 26, 2017, CCA's printing and mailing facility in Boston, Virginia, burned to the ground.

39. By not later than sundown on Sunday, August 27, 2017, Fisher understood that the fire that consumed the CCA facility had commenced in an HVAC unit, known by CCA to be in disrepair, located on the roof of the facility.

40. At approximately 8:00 a.m. on the morning of Monday, August 28, 2017, Alfred Jeffries Marsh ("Marsh") was in a store called the "Boston General Store" in Boston, Virginia, which is attached to the U.S. Post Office in Boston. He had gone there to fetch his mail. He entered the General Store, leaned against the ice cream freezer, and waited for the Postmaster to arrive.

41. Fisher came into the General Store wearing a shirt and tie and slacks, not ordinary dress but not exceptional either. Fisher came to the counter at the and stood about two feet from Marsh. Fisher and Marsh exchanged pleasantries, but no introductions. Fisher then ordered breakfast from one of the owners of the General Store, who was behind the counter.

42. After he ordered his breakfast, Fisher began to talk about the fire that had occurred on Saturday, August 26, 2017, at CCA in Boston. The conversation began when Fisher responded to the following question from the store owner: "Do you know what caused the fire?"

43. Fisher replied: "I think it is arson. I am on my way to meet with fire investigators now, this morning."

44. Fisher then advised Marsh that Fisher was looking for a building in the Culpeper Industrial Park in Brandy Station to move "his printing business," and that Brandy Station is closer than Boston to the Dulles airport.

6

Case 3:18-cv-00063-GEC   Document 1   Filed 08/02/18   Page 6 of 10   Pageid#: 6

45. Marsh, now understanding that he was speaking to Steven Fisher, said to Fisher: "I smelled electrical smoke." Marsh's house was fogged in on the night of the fire with smoke from the fire.

46. Fisher replied: "I have reason to believe that a disgruntled employee that I had dismissed is responsible for the fire."

47. Fisher continued: "She is litigating with me and had ample opportunity to cause the fire. She kept doing work that I told her not to do. And that eventually caused me to dismiss her. I feel for bad for her, but then I found out that her family owns a restaurant in Culpeper at the corner of Route 15 and 3."

48. Marsh replied to Fisher: "You mean you're talking about Sandy Via?"

49. Marsh has known Sandy Via and her family for nearly 50 years. Marsh knew that Via works for or owns her family restaurant at the corner of Route 15 and 3 in Culpeper, the only restaurant at that corner.

50. Fisher looked at Marsh, astonished, and asked: "Is she a friend of yours?"

51. Marsh replied: "Yes, Sandy and her family are friends."

52. Fisher then said: "Well, maybe I shouldn't have said anything."

53. But then Fisher continued: "I think she had ample opportunity, and I think that she holds a grudge against me because the last time I saw her she flipped me the bird."

54. On Monday, August 28, 2017, the *Rappahannock News* reported as follows:

> [I]n an interview Monday morning ahead of a workforce meeting in Culpeper, the CCA's owner and president Steven Fisher told the Rappahannock News that he and his team were already "working on a strategy towards getting everything replaced" and reopening the plant.
>
> "The good news is we have a lot of money through our insurance company," Fisher disclosed, adding that the CCA's hundreds of employees could "be retained" during the rebuilding process via a "government" safety net.

/

"That's my first bit of good news," he said, "retaining our people."

55. On September 1, 2017, CCA summarily terminated Morris's employment, depriving Morris and Via of a reliable source of family income.

56. Morris was one of only two CCA managers who were fired in the aftermath of the fire at CCA on August 26, 2017.

57. CCA knew and intended that Morris's firing would cause continued financial and emotional hardship to Morris and Via.

58. On or about March 11, 2018, Morris filed a charge of discrimination against CCA with the EEOC in Richmond, Virginia.

59. On or about May 3, 2018, the EEOC issued by U.S. mail a notice of right to sue to Morris, which notice Morris received on or about May 7, 2018.

## COUNT I
## VIOLATION OF ADA: RETALIATION

60. Morris incorporates by reference and restates here the allegations in Paragraphs 1 through 59 above.

61. The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act." 42 U.S.C. § 12203(b).

62. By selecting Morris as one of only two managers for termination from employment with CCA in the aftermath of the fire at CCA in August 26, 2017, CCA discriminated against Morris in violation of 42 U.S.C. § 12203(b) because, at the time that CCA terminated Morris's employment, Via was actively seeking redress under the ADA.

8

63. By selecting Morris, Via's wife, as one of only two managers for termination from employment with CCA in the aftermath of the fire at CCA in August 26, 2017, CCA coerced, intimidated, threatened, or interfered with Morris for Morris's actual or perceived aiding or encouraging of Via in the exercise of her rights protected by the ADA, in violation of 42 U.S.C. § 12203(b).

64. As a proximate result of CCA's illegal acts of retaliation against Morris, Morris has suffered substantial harm, including lost income and benefits and other economic losses; mental anguish and emotional distress; loss of professional reputation and quality of life; and other harm to be proven at trial.

**WHEREFORE**, Morris respectfully requests that this Court enter judgment in favor of Morris and against CCA:

(a) ordering CCA to award all relief available to Morris for CCA's violation of Morris's rights under 42 U.S.C. § 12203(b), including reinstatement, back pay, and restoration of benefits;

(b) ordering CCA to pay to Morris the costs of this action and reasonable attorneys' fees as required by 42 U.S.C. § 12117(a);

(c) ordering CCA to pay Morris pre- and post-judgment interest on all damages awarded; and

(c) ordering that Morris be awarded such other and further relief from CCA, at law or in equity, to which Morris may be entitled.

## JURY TRIAL DEMAND

Morris demands a trial by jury as to all issues so triable.

9

Case 3:18-cv-00063-GEC   Document 1   Filed 08/02/18   Page 9 of 10   Pageid#: 9

Dated:  August 1, 2018                                     Respectfully submitted,

                                                           **WILSON LAW PLC**

                                                           /s/ *Robert O. Wilson*
                                                           Robert O. Wilson (VSB 77791)
                                                           2 South Main Street, Suite 409
                                                           Harrisonburg, VA  22802
                                                           Phone: (540) 430-0122
                                                           Email:  robert@thewilsonlaw.com

                                                           *Counsel for Plaintiff*

**OF COUNSEL:**

Mitchell J. Rotbert
(*pro hac vice* motion forthcoming)
**ROTBERT BUSINESS LAW P.C.**
8937 Shady Grove Court
Gaithersburg, Maryland 20877
Phone: (240) 600-6467
Fax: (888) 913-207
Email:  mitch@rotbertlaw.com